NOTICE
Decision filed 05/03/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 210140-U

NO. 5-21-0140

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Effingham County. |
| | ) | |
| v. | ) | No. 17-CF-359 |
| | ) | |
| SCOTT R. LANGFORD, | ) | Honorable |
| | ) | Martin W. Siemer, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the defendant's convictions and sentences, because we conclude that (1) the State proved, beyond a reasonable doubt, that the defendant is the individual who discharged the shotgun in question during the incident in question; (2) the circuit court did not err in its instructions to the jury, and there were no inconsistent verdicts with regard to the offenses of reckless discharge of a firearm and aggravated discharge of a firearm; (3) the circuit court did not abuse its discretion when it allowed the State to call a witness who was not disclosed to the defendant on the State's witness list; (4) the circuit court did not abuse its discretion when it allowed other-crimes evidence of firearms; and (5) the defendant's trial counsel was not ineffective.

¶ 2   The defendant, Scott R. Langford, appeals his convictions and sentences after a jury trial in the circuit court of Effingham County in which he was found guilty of one count of each of the following offenses: (1) unlawful possession of a weapon by a felon, (2) reckless discharge of a firearm, (3) armed habitual criminal, (4) aggravated discharge of a firearm, and (5) unlawful

1

possession of firearm ammunition by a felon. For the following reasons, we affirm the defendant's convictions and sentences.

¶ 3                                    I. BACKGROUND

¶ 4     We recite only those facts necessary to an understanding of our disposition of this appeal. In the fall of 2017, the defendant was charged with several criminal offenses as a result of his alleged possession of a loaded shotgun, and alleged firing of that shotgun toward a group of people, on October 5, 2017. Eventually, he was tried on, *inter alia*, one count of each of the following offenses: (1) unlawful possession of a weapon by a felon, (2) reckless discharge of a firearm, (3) armed habitual criminal, (4) aggravated discharge of a firearm, and (5) unlawful possession of firearm ammunition by a felon. Prior to the defendant's jury trial, which began on August 3, 2020, the parties filed a combined total of over 25 motions *in limine*, the vast majority of which were filed by the defense. The motions of significance to the issues raised by the defendant in this appeal are discussed in detail below.

¶ 5     On February 20, 2018, the State filed a motion *in limine* regarding "other crimes evidence," in which it asked the circuit court to rule "that evidence of the [d]efendant's possession of a pump action shotgun on September 22, 2017," would be admissible at the defendant's trial. The motion asserted that witness Mathew McWhorter would testify that he saw the defendant "seated inside [the defendant's] residence holding a pump action shotgun on or about September 22, 2017," which was relevant to the question of whether the defendant possessed a shotgun at the time of the charged offense approximately two weeks later. On March 2, 2018, the State filed another motion *in limine* regarding "other crimes evidence," in which it asked the circuit court to rule that the testimony of witness Hannah Shearer that she saw the defendant "possess at least six firearms at his residence prior to October 5, 2017," and "saw at least one firearm inside [the defendant's] residence on October 5, 2017, several hours prior to the incident that resulted in the instant

2

charges," would be admissible at the defendant's trial. The defendant thereafter filed, *inter alia*, a motion *in limine* in which he asked that the State be barred from introducing evidence that the defendant possessed a firearm or BB gun at the defendant's mother's house "5 years ago." He later filed motions *in limine* in which he asked that the State be barred from introducing evidence (1) that witness Adam Pipkins saw "a black shotgun" at the defendant's residence, because no foundation existed to place the shotgun in the residence during October of 2017; (2) from Detective Travis Monnet about "the location of the shotgun at or within the [defendant's] residence" unless Monnet was "qualified as an expert witness in ballistics and/or other scientific pursuits related to forensic ballistics"; and (3) about a gun case, because the case was "not found in the first search by law enforcement," but was found during a subsequent search after the house was left unsecured, and the gun case was not connected by "DNA or fingerprints *** to anyone in the house."

¶ 6    On July 21, 2020, a hearing was held on all pending motions. Of significance to this appeal, at the hearing the circuit court granted—without objection from the State—the defendant's motion *in limine* that the State be barred from introducing evidence that the defendant possessed a firearm or BB gun at the defendant's mother's house "5 years ago." The circuit court reserved ruling on whether Pipkins could testify about "a black shotgun," because the circuit court and the parties agreed that they would have to determine what kind of foundation could be laid for Pipkins' testimony before a ruling could be made. The circuit court also reserved ruling on the extent of Monnet's testimony that would be allowed with regard to where the individual who fired the shotgun may have been standing when the shotgun was fired, again because the circuit court needed to first see what kind of foundation could be laid for Monnet's testimony. The circuit court denied the defendant's motion to bar evidence of the gun case, because the circuit court believed the gun case was relevant to whether the defendant possessed a gun. The circuit court noted that the defense could certainly raise the fact that the house was left unsecured between the time of the

3

charged incident and the time the gun case was recovered by law enforcement officers, as well as the fact that the gun case was not connected by DNA or fingerprints to anyone in the house. The circuit court then granted the State's motions *in limine*, described above, without explaining in detail its reasoning for granting them.

¶ 7     On August 3, 2020, selection of the jury for the defendant's trial began. Testimony began on August 4, 2020. The first witness to testify for the State was Douglas Funneman. Because multiple witnesses with the last name Funneman testified, we will refer to each such witness by that witness's first name.

¶ 8     Douglas testified that he had three daughters: Macy, Riley, and Hailey. He testified that he previously had "drug issues" with his daughter Macy, who previously was "on meth and marijuana." He testified that at approximately 10 p.m. on October 5, 2017, he learned that his daughters were at the defendant's residence. Douglas testified that he went to the defendant's residence and knocked on the front door. He testified that the defendant opened the door, and Douglas asked if his daughters were at the residence. He testified that he did not believe the defendant's denials, because the defendant hesitated, so he followed the defendant "up on the porch" as the defendant returned to the inside of the residence. He testified that he was accompanied by his wife, Elizabeth, although she was not on the porch, and by his "neighbor Chad" and a man named Bobbie Russell.

¶ 9     Douglas testified that a friend of the defendant came out on the porch from inside the residence and that the friend and Russell "got to pushing around out there on the porch." He testified that everything happened very quickly, and that when he looked up, he saw the defendant "with a gun." He testified that he saw the defendant loading the gun, then saw "him pull it up and point it towards the door." He testified that at that point, he "stepped behind the door frame," then "heard the shot," saw "the flashes of the barrel," then "felt the pellets go by" his face. Douglas

testified that he "was just kinda dumbfounded," and that he and the others "looked at each other and then got up and ran off the porch." He identified his "neighbor Chad" as Chad Petard, and conceded that "[w]e had been drinking, yes." He agreed that Chad was "highly intoxicated."

¶ 10    Douglas testified that he had experience with firearms, and that he hunted and owned firearms. He testified that he knew what a shotgun sounded like when discharged, and that he could tell that the firearm discharged by the defendant was a shotgun. He described the weapon as "black" or "dark colored," and added that he knew "it was a shotgun by the way [the defendant] was holding it down whenever he was loading it." He testified that based upon the way the defendant was loading the weapon, he believed it was "either a pump or an automatic" shotgun. He testified that although he was at "[t]he door from the porch going into the main living area of the residence," he never "physically [made] it completely into the interior of the residence." When asked if he could estimate how far away the defendant was from him when the defendant fired the shotgun, Douglas testified, "Probably 20 feet maybe." He clarified that on that night, he was looking for both Macy and Hailey. When asked to clarify exactly where the defendant was when he discharged the shotgun, Douglas testified, "Pretty sure he was in between the kitchen and the living room, right in that doorway there."

¶ 11    On cross-examination, Douglas agreed that he had been drinking at the time of the incident, and agreed that he had previously told investigators that he "had been drinking since early in the afternoon *** [a]round 4 o'clock." He agreed that he had "10 to 12 beers" between 4 p.m. and when he went to the defendant's residence at around 10 p.m. He agreed that since the incident, he had spoken multiple times to multiple investigators, and that he had a clear memory of the event. When asked if he originally told investigators that the first person to come to the front door was not the defendant, but was instead a man with a "scruffy" and "unshaven" face who was unknown to Douglas, Douglas testified that it was possible that he said that, and he agreed that was different

5

from the testimony he had just given in court. He also agreed that "until last week" he never told investigators that Russell was one of the people who accompanied him to the defendant's residence that night. He added that Russell "wanted his name to be left out," and that he complied with that request. Douglas denied that he asked his sister-in-law to "hide [Russell] from the police." He thereafter agreed that he was "hiding Bobbie Russell from the police[,] [a]nd in all the statements [he] gave up until last week." He agreed that Russell was also very intoxicated, and in fact lost one of his shoes that night.

¶ 12    When asked if he recalled telling investigators that the defendant "would have been standing approximately 30 feet from the door that went to the porch," Douglas testified: "However far it is across the living room." He thereafter agreed that it might have been 30 feet, and agreed that he told investigators it was approximately 30 feet. He denied that Russell had a gun that night. He clarified that he could not feel the "heat" of the shotgun blast, but could feel "the pellets" go past him. He agreed that he might have told investigators that he felt the heat. He agreed that if he could feel the heat, that would mean the gun was "really close" to his face, and was not 30 feet away. He added, "He could have been closer. However far the living room is."

¶ 13    On redirect examination, Douglas agreed that he never had the chance to measure the distance between himself and the defendant when the defendant discharged the shotgun, either by using a tape measure or by pacing off the distance. He testified that Russell—whose nickname was "Possum"—was with Douglas on the porch when the shotgun was discharged. He testified that the only reason he did not mention Russell to investigators was because Russell asked Douglas to keep Russell out of it. On recross-examination, Douglas agreed that he never asked investigators to measure how far the defendant was from Douglas when the defendant fired the shotgun, but stated: "Why would I have to know how far it was?" When asked if Douglas hid Russell from the police because Douglas "brought Bobbie Russell to [the defendant's] home *** Russell discharged the

6

shotgun *** [a]nd then [Douglas] hid [Russell] from the police and from everybody else," Douglas testified, "That's totally false."

¶ 14    Elizabeth Funneman testified that she was a registered nurse, and that she and Douglas had three daughters. She testified that their daughter Macy previously had "problems" with drugs. Elizabeth testified that on October 5, 2017, she accompanied Douglas, Chad Petard, and Bobbie Russell to the defendant's residence. She testified that Douglas knocked on the front door, and that she stayed outside of the porch area because Chad told her "not to go up there." Although she could not see what was happening from where she was, she "heard a gunshot," then "went around and got back into [her] car." She testified that she had been hunting before, and had "fired firearms before," and knew what a shotgun sounded like. She testified that she did not see the defendant at all that night. She testified that none of the men who accompanied her to the residence had "any firearms on them." Elizabeth testified that although Russell "said he got shot," she did not remember Russell having any injuries.

¶ 15    On cross-examination, Elizabeth agreed that she was not impaired at the time of the incident, or when she later spoke to police, and further agreed that she never told the police about Russell's presence on the night in question. She agreed that she did this to "protect" Russell, and further agreed that by failing to tell the police about Russell's presence, she had "lied to the police." She agreed that Russell was intoxicated that night and lost one of his shoes. She testified that she could not remember who the first person who came to the door was: a female child or Pipkins. She testified that she did not ask anyone to hide Russell, but agreed that her daughters understood from her and Douglas that they should not mention Russell's presence at the incident.

¶ 16    Macy Funneman testified that she was 18 years old, and that she knew the defendant, who she identified in court. Macy testified that on October 5, 2017, she was "[h]anging out" at the defendant's residence, along with her sister Hailey, Adam Pipkins, and the defendant's children.

7

She testified that she had babysat the defendant's children in the past, but that on October 5, 2017, she was not babysitting. She testified that she was not using meth that day, but was using bath salts, which she obtained from the defendant at the defendant's residence. She testified that she was sitting at the kitchen table when her "parents showed up," and that she and Hailey "ran out the back door" when they heard their father's voice asking if they were there. Macy testified that on October 5, 2017, "[t]here was a gun" in the kitchen that she had not seen there before. She described it as "black" and "long." She testified that the gun was "[l]eaning against the kitchen table."

¶ 17    On cross-examination, Macy denied that her parents ever asked her not to mention Russell's presence that night, and testified that she did not see Russell that night. She testified that she could not remember for certain if on the night of the incident she told police about the gun in the kitchen, but that she was "pretty sure" that she told them. She testified that she did not know why that information would not have been included in police reports. She testified that she was not "stoned" on the night of the incident, and that she did not recall telling Detective Monnet that she "just saw the tip of the gun." She agreed that she was not prosecuted for any of her conduct on October 5, 2017. Thereafter, she agreed that she did see Russell that night, because Russell came in the back door for a moment and told her and Hailey to leave. She further agreed that she never disclosed Russell's presence to police, but she continued to assert that her parents did not tell her not to mention Russell. On redirect examination, Macy testified that she remembered being told by the State that she would not be prosecuted for any crimes related to meth or bath salts if she testified truthfully at the defendant's trial, and agreed that she was testifying truthfully at the trial. She further agreed that she was 15 years old at the time of the incident in question.

¶ 18    Travis Buhnerkempe testified that he was a patrol sergeant with the Effingham County Sheriff's Office, and that on October 5, 2017, he was dispatched to the defendant's residence in

Deiterich because someone reported being shot at there. He testified that when he arrived at the residence, he and another deputy created a perimeter around the residence. He testified that despite repeated attempts at the residence, and by phone through his dispatcher, authorities were not able to make contact with the defendant on the night of the incident.

¶ 19    On cross-examination, Buhnerkempe agreed that Hannah Schearer arrived at the residence while he was there, and that she gave a statement, but did not mention "anything about [the defendant] having a gun there that night." When asked if Douglas told the deputies "that the blast [from] the shotgun that night was so close that he could feel the flame blowing past his face," Buhnerkempe testified that Douglas "would have told Deputy Hardiek that—some of that explanation. He said whatever came from the shotgun went by the left side of his face. I don't think he said flame." He testified that Macy was present, and gave a statement, but that she never mentioned that she saw a gun that night. He agreed that Douglas, Elizabeth, Macy, and Hailey all failed to mention Russell being present. He testified that Elizabeth described the person who came to the front door "as having a dark beard or scruff on his face," but that Elizabeth did not believe it was the defendant.

¶ 20    On redirect examination, Buhnerkempe testified that his initial interview with Macy was not "lengthy" and was not "a full interview," because the deputies "were trying to ascertain details of what happened so we could decide how we were to proceed in regards to who may or may not still be at the residence and where [the defendant] had gone." On recross-examination, he agreed that nothing that night prevented anyone from telling him about Russell's involvement in the incident.

¶ 21    Phillip Hardiek testified that he was a sergeant with the Effingham County Sheriff's Office. He testified that on October 5, 2017, he was dispatched to the defendant's residence for a "shots fired" call, and that after setting up a perimeter at the residence, no contact with the defendant

could be made. He agreed that thereafter he spoke with Macy and Douglas near the scene. On cross-examination, Hardiek agreed that it would be "fair to say that nothing was done to secure the house and the scene for investigation purposes at that time," answering: "That would be accurate. We cleared the perimeter." Hardiek agreed that when he spoke with Douglas and Macy near the scene, neither one of them told him of Russell's presence at the defendant's residence during the incident. He agreed that it "would be reasonably accurate" to say that "Chad Petard was so drunk that he was basically worthless as a witness." He agreed that Douglas described the first person to answer the front door as "a male, dark or black facial scruff." When asked if Macy mentioned to him that she saw a weapon at the defendant's residence that night, Hardiek testified, "I don't believe Macy mentioned a weapon, no." He agreed that if Macy had mentioned a weapon to him, he would have put that in his report.

¶ 22    Hannah Shearer testified that she was 28 years old, and that on October 5, 2017, she believed she saw the defendant at his residence. She testified that in the past, she had problems with drugs, including heroin and bath salts, but that she was presently "clean and sober." She testified that she was "still using" in October of 2017, and that she and the defendant were in a "complicated" relationship that was "[a]t certain times" like a boyfriend/girlfriend relationship. She testified that she was at the defendant's residence on October 5, 2017, and that she thought Adam Pipkins and Holly Baker were present during that day as well. She testified that she left during the evening, with Holly Baker, and that only Pipkins, the defendant, and the defendant's children were still there after she and Baker left. She testified that when she returned later, there were police officers at the house.

¶ 23    Shearer testified that she spoke to the defendant by phone approximately a week later, and that thereafter they went together to the home of a friend of the defendant in Effingham. She testified that she saw "just one" firearm at the defendant's residence on October 5, 2017. She

testified that she was not very familiar with firearms, but described the one she saw as "a bigger one." She testified that she could not recall ever seeing firearms at the defendant's residence prior to October 5, 2017. She testified that later, when she was camping in a tent in the woods with the defendant, the defendant told her about the night of October 5, 2017. Shearer testified that the defendant told her "that the girls' dad had barged into his house," and that the defendant tried to defend himself and his children "by shooting the gun at the guy." She identified the defendant in court. She agreed that she had a lot of legal problems at the time of the incident, and that she was wanted on a warrant at the time she was camping in the tent with the defendant. The State listed a number of her offenses, with which she agreed, and she further agreed that she "faced significant time in custody or locked up" at the time she was finally arrested on her warrant and agreed to talk to the police. She also agreed that the State "made *** a promise" not to prosecute her "for anything that happened with [her] and [the defendant] when [they] were running around together back in October of 2017," if she testified truthfully at the defendant's trial.

¶ 24    On cross-examination, Shearer agreed that when she returned to the defendant's residence on October 5, 2017, there were officers present and they asked to speak to her. She did not agree, however, that she spoke with officers that evening, stating, "To my knowledge, no, I did not talk to them that night." She subsequently testified, with regard to her cooperation with the police in this case after she was arrested and jailed, as follows:

> "They came to me the first day and asked me to talk to them. I told them no. I just wanted to go back to sleep. They came to me two days later and, um, asked me if I'd talked to them, they would let me out. They let me out a week later and I ended up going back to jail and sat six months."

¶ 25    Following Shearer's testimony, the State—with the agreement of the defense—offered into evidence a number of photographs that were taken of the defendant's residence by law enforcement

officers on October 6, 2017, the afternoon following the shooting. Thereafter, the State, without objection from the defense, published the photographs to the jury. While the jury viewed the photographs, the parties and the circuit court held a side bar, then there was a brief recess. Thereafter, the State called its next witness, Travis Monnet.

¶ 26 Monnet testified that he was a detective with the Effingham County Sheriff's Office. He was questioned about his training and background with regard to "firearms and ballistics," about which he provided extensive testimony. Thereafter, Detective Monnet was tendered as an expert witness in general ballistics and firearm projectiles. The circuit court agreed with the tender, but at the request of the defense, cautioned the jury that the witness's testimony about other matters was not to be considered expert testimony.

¶ 27 Monnet testified that when he arrived at work on the morning of October 6, 2017, he was dispatched to the defendant's residence. He described the layout of the residence. He testified that later on October 6, 2017, he returned to the residence to search its interior. He testified that he found a gun case in the pantry area off the kitchen. He described the area as "messy," and further testified that he found two loaded 20-gauge shotgun shells inside the gun case. Monnet thereafter testified that he found a third shotgun shell underneath a chair in the kitchen of the defendant's residence.

¶ 28 Monnet next testified about damage to the porch area of the defendant's residence. He testified that he removed "bird shot pellets" from the front wall of the porch, and that "[t]here was a gunshot pattern on the front porch consistent with bird shot being fired at it." He described how bird shot is loaded into shotgun shells, and what happens when a shotgun is discharged and the shell leaves the barrel. He added:

"When these are fired out they come out of the end of the shotgun in a cone. If you can imagine a flashlight and you shine it on a wall, the farther away you get from the wall,

12

meaning the farther the beam shines, the bigger the pattern. That's how these shot shells are fired."

Monnet testified that "if you are up real close to these, they do some massive damages." He testified that the shotgun shells he found would have been fired from a 20-gauge shotgun, then testified as to how a 20-gauge shotgun works. He thereafter testified as to the bird shot pattern on the front porch wall, as well as to the orientation of the door that separated the porch from the living room area, ultimately opining that based upon the stippling—which was described as "the damage caused by the projectile path"—he observed, the shotgun was fired on the night in question "from inside the residence." Monnet testified that he found gunshot residue on the door, which dissipates quickly but was still present that afternoon. He testified that no weapons were recovered during the investigation of the October 5, 2017, shooting incident.

¶ 29    On cross-examination, Monnet agreed that he was not a crime scene investigator, and that no crime scene investigator was called to the scene in this case. He agreed that "[n]ormally" a crime scene would be secured as soon as it was feasible to do so, and that in this case, the scene was not secured until the afternoon of October 6, 2017, approximately 16 or 17 hours after the shooting. He agreed that it was "possible" that someone could have entered the residence while it was not secure. Monnet also agreed that the pellets he recovered from the front porch wall of the residence were not sent to a crime lab to be processed or analyzed. He testified that from his training and experience, "there's not really anything from an evidentiary standpoint that I would want to send to the crime lab." He testified that the explosion from the firing of the shotgun would have destroyed any DNA evidence on the pellets. He testified that it was "[p]ossible" that the gun case or the items found in it could have DNA, fingerprint, or hair evidence on them, but that they were not tested either. Monnet agreed that it was possible that latent fingerprints could have been recovered from the brass of the shotgun shell cartridge. He agreed that although the cartridge was

swabbed for DNA evidence, it was never tested and compared to the defendant's DNA, even though the circuit court gave permission for it to be tested and compared.

¶ 30    Still on cross-examination, when Monnet was asked by defense counsel if one of the photographs taken during the investigation and admitted into evidence at trial showed "a gun \*\*\* in the cushions of the couch" in the defendant's residence, Monnet answered, "That's a BB gun." He agreed that the BB gun had "a black handle on it." He further agreed that no DNA, fingerprint, or other testing was conducted regarding the BB gun, and that no shotgun, and no spent shotgun shells, were recovered from the residence. Monnet agreed that his earlier testimony in proceedings in this case was that the muzzle of the shotgun that was fired on October 5, 2017, "would have had to have been just a few feet away from the doorjamb" for it to create the gunshot pattern he observed. He agreed that the gun could not have been 30, or even 20, feet away when it was fired. He testified that he had reviewed the report prepared by the defendant's expert witness, and disagreed with the report because the report stated, in one section, that the gun was 5 feet away, and in another section stated that it was 10 feet away. He agreed that the report was "[s]omewhat consistent" with his own report, but added, "If he's trying to give an exact distance of the determination of range, you cannot do that."

¶ 31    After studying photographs of the layout of the house, Monnet agreed that the glass in a curio cabinet in the residence had not been damaged by the shotgun blast. He agreed that because the shot pattern did not hit the curio cabinet, the shotgun "had to be relatively close to it," which was not consistent with the gun being fired from far back in the kitchen. He thereafter testified that Pipkins told police, on October 6, 2017, that Pipkins "did not see [the defendant] shoot a gun." Monnet agreed that on November 30, 2017, he reviewed recorded phone calls at the Effingham County jail, and that on that date, the defendant stated in a phone call that he did not have a gun,

14

and that "Bobbie Russell brought the gun." He agreed that Russell was not interviewed at any point in the investigation.

¶ 32    On redirect examination, Monnet testified that he did not send the gun case to be checked for fingerprints because the gun case was made mostly of cloth, and "you can't lift fingerprints from cloth" which is "porous material." He agreed that testing the gun case for the defendant's hair would not have been helpful, because the case was found in the residence where the defendant lived. With regard to the DNA evidence that was not tested, Monnet testified that "dropping the ball" by the lab "could be" why the testing did not occur. He testified, "I was never given the results of the test." When asked if he thought "that BB gun *** had much worth in the course of [his] investigation," Monnet testified, "No." He testified that it was not relevant based upon the information they had about the gun that was fired in this case. He testified that the BB gun could not have produced the gunshot pattern observed in this case, or the noise heard by the witnesses, and that in light of the poor condition of the BB gun, he did not even know if it was operable, or was just something "kids had used to play with or something." With regard to the report by the defendant's expert witness, Monnet testified that to determine where the shotgun was located when fired, one would have to have both the shotgun and "the exact same ammunition that was fired," whereas investigators in this case did not have the shotgun or any spent shotgun shells. Monnet thereafter added:

> "You can open up any Guns and Ammo magazine at Walmart and look at the ammunition comparisons and you will see the same weapon fired from the same distance with different rounds in it and you will see completely different shot patterns no matter what. But every ammunition fires differently. That's why you have to have the exact same ammunition to perform these tests and you have to have the same weapon."

15

¶ 33 Adam Pipkins testified that he was 38 years old, and was currently serving an 8-year sentence in the Illinois Department of Corrections "for a meth case out of Clay County." He testified that he was at the defendant's residence on October 5, 2017, and that the residence had a fully enclosed front porch, with four walls and with windows. He testified "[t]hat evening a bunch of people showed up to [the defendant's] house while we were sitting there," and that "four or five of them forced their way into his house." He testified that prior to that, someone named "Possum," whose real name Pipkins did not know, "just walked in through the back door." He testified that he confronted Possum at that time, that the defendant told him Possum "was all right," and that Possum then mumbled he would be back, and left. Pipkins testified that he followed Possum to the back door and locked it after Possum left. He testified that next he walked to the front door on the porch to check it, and that he found "[i]t was standing open." He testified that when he reached the front porch door to close it, he saw "like four or five people walking around the corner of the house." He testified that "some big burly guy stuck his foot in the door" before Pipkins could close it. Pipkins testified that the man forced the porch door open, and another man passed him. He testified that he hit the second man. He was not sure who the second man was, but he thought "it might have been the Possum guy." He thereafter clarified that it was Possum. As he struggled with Possum, he called for the defendant. He testified that after he slammed Possum against the wall, Possum let go of Pipkins, and Pipkins tried to run back into the house, but his way was blocked by the "big burly guy" and another man. He testified:

> "Right before I got to the door, I put my hand on the big guy and I'm like 'hey there is kids in the house. Get out of here.' And no sooner than that, that was when I felt the heat from, the heat from the shot or the gun that went off. And the flash from the gun."

¶ 34 Pipkins testified that he did not see who fired the gun, but that the gun was fired from "[r]ight in front of" him, and "couldn't have been" fired from inside the house, in the living room,

16

because Pipkins was still "out on the porch." He added, "There is no way it could have been inside the house for it to feel the heat from the gun." He testified that the gun sounded like a shotgun. He testified that he did not see Possum with any firearms when Possum entered the back door of the residence, and that he did not see any firearms on Possum or the other men when they entered the front of the residence. He testified that Hailey and Macy had already left by the time Possum entered the back door. He testified that after the gun was discharged, the men who had entered the porch "kinda backed out and more out of the door area." Pipkins testified that he went back into the house, where he saw the defendant's children "standing on the back of the couch," and where he saw the defendant "standing in the middle of the living room or back in the dining room on his phone." He testified that he told the defendant to call the police, which the defendant did, but that Pipkins left before the police arrived.

¶ 35 On cross-examination, Pipkins agreed that he gave a statement to police on October 6, 2017, which was recorded. He testified that when the gun was discharged, he was "[k]inda squeezed in between the doorframe and" one of the men trying to enter the house. He clarified that the door he originally tried to close to prevent the entry of the men, "would have been the door that actually goes to the outside" from the porch. He testified that a woman was present as well, but that he only saw her outside of the porch. He testified that he did not see the defendant with a gun that night, and that the gun was so close to him when it was discharged that he "felt the burn" and believed he had been shot. When asked if Possum was carrying a shotgun that night, Pipkins answered, "It would have been—had to have been after the fact that we were fighting. When he originally came back into the house, no he didn't. I know because I was fighting with him." On redirect examination, Pipkins clarified that although he saw multiple individuals outside of the front porch, only the three males entered the front porch where the fighting took place.

17

¶ 36    Following the testimony of Pipkins, the State announced that it would be calling Bobbie Russell as its next witness. Defense counsel asked for a side bar. At the side bar, counsel stated that Russell had not "ever been disclosed to" the defense, and that no law enforcement officers interviewed Russell as part of their investigation. He stated that defense investigators interviewed Russell approximately one week before trial, and that only then did Douglas Funneman give a statement saying that Russell was present on October 5, 2017. The State countered that although it was true that police did not interview Russell, the defense "actually disclosed Bobbie Russell." The State contended that the defense "absolutely" had Russell's statement, because it was tendered by the defense to the State on Monday of that week, which meant that there was "no surprise here." The State added:

> "And as the court is aware, the State does have a continuing duty to investigate whenever the case is going on. [Defense counsel] tendered statements. We investigated it. We located Mr. Russell and from there decided that he would be a useful witness in our case in chief."

¶ 37    The State posited that if anything, the defense "was late in complying with the discovery by waiting until after the trial had begun to finally furnish all the reports to the State." The circuit court noted that, "As far as disclosures, I would agree that that is not a witness who was disclosed by the State," but added that during a conference prior to jury selection, it was the defendant himself who suggested that Bobbie Russell be added to the witness list. The circuit court opined that "it seems a bit disingenuous to claim surprise and object when it's the defendant who made the disclosure at our initial conference before jury selection and asked that that name be included" on the list of potential witness names to be read to the potential jurors. Defense counsel agreed that what the circuit court stated was correct, but argued that the State could not call Russell in its case in chief, and could only "call him possibly in rebuttal." The State countered that "once a witness is disclosed, either side can call" that witness. The State added that Russell's "name was given to

18

the jury during *voir dire*, so there is no surprise there." The circuit court took a brief recess to conduct research, then ruled that Russell would be allowed to testify in the State's case in chief, because all of the information provided by the parties led the circuit court to conclude "that this does not come as a surprise" to the defense.

¶ 38    Bobbie Russell testified that he was sometimes known by the name "Possum." He testified that he had known Douglas and Elizabeth Funneman his entire life. He testified that on October 5, 2017, he rode with Douglas, Elizabeth, and "Chad" to the defendant's residence. Russell testified that he knew the defendant, then identified the defendant in the courtroom. He testified that when they reached the defendant's residence, he "went right in the house" through the back door, spotted Hailey and Macy, and told them, " 'you two, outside right now. Your parents are here.' " He testified that the defendant was busy with the defendant's children and did not see him, and that no other adults were present. He testified that after he ordered them out, the Funneman girls "blew right past me and I backed out." He testified that he saw Elizabeth on the other side of the house, and that he, Douglas, and Chad entered the covered front porch area.

¶ 39    Russell testified that Douglas then knocked on the front door, and that an adult man answered it. He added, "But once I got in the door, we started—me and that other person started fighting." He testified that he was trying to enter the house because he was concerned that the third Funneman daughter, Riley, might be inside. He agreed that the fight took place on the front porch, adding, "I didn't leave the front porch after I got on it." He testified that as the fighting continued, "I look up. There is him, [the defendant] or whatever, standing there coming at us with a shotgun apparently." When asked why he said "apparently," Russell testified, "He had a damn gun in his hand." He testified that he knew it was "a real gun" because "it wasn't no fake when you are breaking it open and sticking a shell in it." He testified that he was "standing in the doorway in the middle" when the gun was fired, and that the defendant "was coming through like the kitchen or

19

dining room area." He testified that he saw "the fire fly out of the gun," and that it knocked him to the ground. He testified that he thought he had been shot. He testified that "[o]ne shot only" was fired, before he and the other men left. He testified that he did not bring a gun with him that day, and did not "grab a gun" while he was at the defendant's residence. He testified that he did not see any other guns, and did not touch a gun that day at all. He testified that none of the men he was with, including him, went from the enclosed porch into the house.

¶ 40    On cross-examination, when asked if he was "so drunk" that he lost his shoes that night, Russell testified, "Well you get shot in the damned head. You'd leave your shoes too, wouldn't you? If a man wants you out of your [*sic*] house." He then asked the circuit court if he could leave. He was told that he had to remain and answer defense counsel's questions. He agreed that he and Douglas were drinking on the night in question, then added that he probably drank "ten Fireballs" that night, and that he was "a drunk." He reiterated that he drank a lot, and was "a drunk," but insisted that he could remember "getting shot in the face," and what happened that night. He agreed that he had waited almost three years to give a statement in the case, but questioned why he would want to give a statement. He denied that he was hiding anything, but agreed that he never went to the police or the state's attorney to give a statement. He testified that he "didn't think it was necessary," because "[i]t was done and over with." He thereafter agreed that he was testifying under subpoena.

¶ 41    Subsequently, Russell became agitated and argumentative with defense counsel, but agreed that he had spoken to the defense investigator the prior week, and had stated that he would come to the trial and tell the truth. When Russell became agitated again, the circuit court took a recess, and subsequently advised Russell, outside the presence of the jury, that if Russell refused to answer defense questions, it could "lead to jail time for refusing to comply with the terms of the subpoena." When asked for input, the State opined that cross-examination should continue, if Russell were

20

given "five minutes" to "calm down a bit." Russell denied that he would calm down. Following further discussion between the circuit court and the parties, defense counsel opined as follows:

> "this witness is a clown and he's doing a clown show. He knows what he is doing. He had no problem, no agitation, nothing when he was talking to the State. And I asked him a couple questions and everything I get hit with is an answer, a question with a question. And he's frustrating the means and ends of justice."

¶ 42    Defense co-counsel thereafter stated, "the remedy we are asking for is we are making a motion to strike his testimony and restore the trial to the status quo. That's the remedy we are asking for." The State argued that cross-examination should be allowed to continue, to see if it could succeed. The State offered to advise Russell that the State would "not prosecute him for anything" related to the shooting incident, which would remove any invocation Russell could make of his right not to incriminate himself. The State thereafter opined that Russell's testimony was in large part consistent with Pipkins' testimony anyway, noting that both men testified that "[e]verybody was out in the porch when the gun went off." Defense co-counsel reiterated that the defense was asking only that Russell's testimony be stricken, not for a mistrial.

¶ 43    The circuit court ruled that Russell would be admonished that the State had advised that Russell would not be prosecuted for his role in the shooting, which meant that Russell was required "to answer in a non-hostile manner to the questions posed by [the defense] and not be argumentative in that." The circuit court stated that if Russell refused to comply, Russell would "have a sanction for contempt." The court further stated that if Russell "continue[d] in this manner," the circuit court would "reconsider the motion from the defendant." Still outside the presence of the jury, the circuit court admonished Russell as described above, adding that a finding of contempt "would likely lead to some jail time." Russell thereafter stated, "I apologize." The

circuit court suggested to Russell that he listen to the questions, give them "some thought and then give your answer." Russell stated, "Short minded with him. I apologize about that."

¶ 44    Defense counsel requested a short break to speak privately with the defendant, which was granted. Thereafter, the jury was brought back in and advised by the circuit court that cross-examination would continue. The circuit court told defense counsel that he could continue. Rather than asking any questions, defense counsel stated, in total, the following: "You know, Mr. Russell, you don't want to answer my questions. I don't have any more questions for you." The circuit court responded, stating, "To be clear, [defense counsel], you are not proceeding with any further cross-examination?" Defense counsel answered, "I am not with this witness. No, sir." The State declined to conduct redirect examination of Russell, who was then excused.

¶ 45    By stipulation of the parties, an edited version of the 911 call placed about the shooting was played for the jury. The State then called Mathew McWhorter as its next witness. McWhorter testified that he was 30 years old, and that he knew the defendant. He testified that on September 22, 2017, he gave Hannah Shearer a ride to a house in Dieterich. When they arrived at the residence, the defendant was "in the kitchen." McWhorter testified that "[i]n a corner" of the residence, he saw what "[l]ooked like a shotgun." He testified that he had been around firearms before, and knew what a shotgun looked like. He testified that the firearm he saw "looked like a pump shotgun." He agreed that he was currently on probation "for a meth case" and had "some [other] criminal history." On cross-examination, McWhorter conceded that although he testified that he remembered being at the defendant's residence, he presently could not remember if he spoke to law enforcement officers in 2017 about being there.

¶ 46    Following McWhorter's testimony, the State rested. The first witness presented by the defense was David Lombardo. By stipulation of the parties, Lombardo was qualified as an expert witness on firearms and ballistics. Lombardo testified that based upon his examination of all of the

22

evidence presented to him in this case, his opinion was that the muzzle of the shotgun that was fired at the defendant's residence on October 5, 2017, was "no more than five or six feet" from the door that was damaged in the shooting. He testified that he was "[v]ery certain about that." He testified that if the gun had been fired from 28 feet away, the curio cabinet near the door would have been hit, but there was no damage to indicate that it was hit by any of the shotgun pellets.

¶ 47 On cross-examination, Lombardo testified that the "shot hit the doorjamb first," and then traveled upward and hit the actual door. He agreed that the shot traveled "from inside the house to outside towards the porch." When asked if someone on the porch could have fired the shot, he testified no, and agreed that "the shot had to have originated from inside the house." He agreed that he had to "approximate" the distance of the muzzle from the door, in part because he did not have the actual shotgun that was fired, and "different shotguns have different characteristics."

¶ 48 Brad Schumacher testified that in October of 2017, he owned a machine shop that was next door to the defendant's residence in Dieterich, and that he knew the defendant. Schumacher testified that on October 6, 2017, the day after the shooting, he was able to observe the defendant's residence, and that he saw the defendant enter, then leave, the residence that day. He testified that he believed the defendant had a shirt in his hand when he left the residence. He agreed that he would have seen a shotgun if the defendant had been carrying one that day, and agreed that he did not see one. On cross-examination, Schumacher agreed that he did not observe the residence all day, as he spent most of the day working in his shop. Following his testimony, by stipulation of the parties, the circuit court informed the jury that if an additional witness—Taj Muleani—were called to testify, he would testify that he was at the defendant's residence on October 3, 2017, and did not see any weapons there, and that he owned a gas station and liquor store near the residence.

¶ 49 Rex Shaw testified that he knew the defendant. Shaw testified that Shaw had "multiple" felony convictions from various Illinois counties. He testified that he was at the defendant's

23

residence on October 5, 2017, from approximately seven to nine o'clock in the evening. He testified that "the Funneman girls" were at the residence, and that the defendant was trying to get them to leave, because the defendant "didn't want them there." Shaw testified that he left before the girls did, and that he did not see any firearms at the residence. On cross-examination, Shaw agreed that he did not "search the house for any firearms." On redirect examination, Shaw testified that if there had been a shotgun in the kitchen, he would have seen it, and because of his felon status, "would not have stuck around at all."

¶ 50     After Shaw's testimony, the court recessed for the day. The following morning, before the jury arrived and before testimony resumed, an "initial informal" jury instruction conference was held. Thereafter, the defense called Carla Segarra as its next witness. Segarra testified that she was the sister of Elizabeth Funneman. She testified that "late at night" on October 5, 2017, Bobbie Russell knocked on the door of her house in Deiterich. She testified that "he was intoxicated," and that he told her that he had been in a fight and been shot at. She testified that she did not observe any wounds on Russell. She testified that Russell told her that he had been shot with a "BB gun." She testified that there was no doubt in her mind that that was what he told her. She testified that she knew the defendant, had visited his residence, and had never observed a gun there. She testified that she had known Russell all her life, that Russell drank "[m]ost of the time," and that when she saw Russell that night, Russell was "[v]ery" intoxicated. She testified that Russell did not say that the defendant was the person who shot him, only that he was shot at and hit. She reiterated that she did not see any wounds on Russell. Segarra testified that prior to the trial, the last time she saw Russell was approximately one year before the trial, at a tavern in Wheeler, and that Russell told her to "remember" that he was not present at the shooting. She testified that he told her that more than once, because Russell stated that he had talked to the police and told them that he was not present that night. She agreed that she had been to the defendant's residence multiple times, and

24

that if a shotgun was "out laying around or in the kitchen or laying against a chair or against a wall," she "would have seen it," but that she never saw a firearm there. On cross-examination, Segarra agreed that she was not at the defendant's residence at all on October 5, 2017.

¶ 51 Kelly Langford testified that she was the defendant's sister, but did not testify about the events of October 5, 2017, or about anything else of relevance to this appeal. The State declined to cross-examine her. Following her testimony, the defense rested. After a final jury instruction conference, the parties presented closing argument. The State argued, *inter alia*, that all of the "overwhelming" circumstantial evidence presented to the jury at the trial showed that no one but the defendant could have fired the shotgun during the altercation at the defendant's residence on the night in question. The State pointed out, *inter alia*, that all of the witness testimony placed all of the adult males other than the defendant on the porch, with the defendant being the only adult still in the house, and that the physical evidence from the expert witnesses for both the State and the defense made it clear that the shot was fired from inside the house, not from the porch.

¶ 52 During its closing argument, the defense contended, *inter alia*, that on the night in question, "an angry, drunken mob" appeared at the defendant's residence, and that it was not clear from the State's evidence who actually fired the shotgun that night. The defense pointed out that Douglas's testimony was that the defendant was 30 feet away from the front door when the gun was fired, but that the physical evidence from the expert witnesses for both the State and the defense made it clear that the shot could not have been fired from that far away. After pointing out that Douglas and Elizabeth lied to the police about Russell's presence that night, and after again arguing that they participated in "vigilante mob action," defense counsel opined that Douglas "and his co-conspirators really, really have nothing but contempt for justice in this county and for the justice system." He added, "And indirectly to you as jurors they have contempt for you." With regard to Russell, defense counsel then added:

"Especially, especially Bobbie Russell. It wasn't contempt for me he was showing. He was showing it to the court by what he did that day. And he showed it to you when he testified yesterday. Wouldn't answer the questions."

¶ 53   Defense counsel argued that it was the defense that found Russell, not the State, because the State "kept Bobbie Russell buried." Counsel argued that Douglas and the others realized that Russell was the "weak link" in their "conspiracy" to harm the defendant, reiterating:

"He is the weak link in the conspiracy that when you saw how he behaved when I asked him. I was trying to ask him straight out yes [or] no questions. 'Sir just answer questions we will get you out of here and get you done.' No no no. Possum wasn't going to answer questions. *** Doug Funneman knew that Possum would screw up the story if the police ever came calling and that's why they buried him for almost three years. That's why the stakes were so high because of the things that could have done. You got Possum drinking ten shots of fireball a day and still downing six or seven drinks a day, he wouldn't have been able to talk to the police for more than a few minutes before he blew his top just like he did when I was talking to him."

¶ 54   Defense counsel subsequently added, "Guess what Doug Funneman and his conspirators want to do to you folks? Each and every one of you. They want to dupe you." Counsel then argued that there were many shortcomings in the police investigation in this case, and various ways in which the police "dropped the ball" and failed to pick it back up. Counsel thereafter returned to Russell, stating:

"Bobbie Russell, he was a clown. He was part of the conspiracy. And he wanted—the people in the conspiracy did not want him to talk to the police. And consistent with that, even though they knew about him last week, the police still didn't go out and get a statement from him. They still didn't get any part of the investigation. Still didn't submit

26

him to a story as part of the investigation. They just let him come up here and answer questions and then he didn't like my questions so he quit answering questions."

¶ 55    Counsel discussed in detail some of the other evidence presented, and why that evidence called into question the State's theory that the defendant fired the shotgun. Counsel thereafter returned to Russell again, stating as follows:

"So Carla explained why Bobbie Russell is a clown. Not worthy of belief because all these things, they happened immediately after this, she got a chance to see him and none of it happened the way he said it, because there would have been objective proof he was injured. He'd have blood on his face, his head, whatever."

¶ 56    In rebuttal, the State again conceded that the Funnemans were not ideal witnesses, but again argued that it was clear from the testimony of everyone involved—including Pipkins, who had no reason to lie for the Funnemans or anyone else—that the defendant was the only adult in the house when the shotgun was fired, and that the shotgun had to have been fired from inside the house. The State also reiterated that the defendant left the scene before the police arrived that night, which the State had previously argued showed consciousness of guilt.

¶ 57    Following closing arguments, and a lunch recess, the jury was instructed and retired to deliberate. Thirty minutes later, the jury sent a note to the circuit court which stated that the jury wished to know the time at which the 911 call was placed in this case. The parties and the circuit court agreed on how to handle the question. Approximately 30 minutes later, a juror who had changed her last name since her jury summons was issued asked how she should sign the verdict forms. The parties and the circuit court agreed on how to handle this question as well. Approximately 90 minutes after that, the jury returned with guilty verdicts for the offenses of (1) unlawful possession of a weapon by a felon, (2) reckless discharge of a firearm, (3) armed

27

habitual criminal, (4) aggravated discharge of a firearm, and (5) unlawful possession of firearm ammunition by a felon.

¶ 58    On September 4, 2020, defense counsel filed a posttrial motion in which counsel argued, *inter alia*, that the defendant was not proved guilty beyond a reasonable doubt, other-crimes evidences was erroneously admitted at the defendant's trial, and Bobbie Russell was not a disclosed witness and should not have been allowed to testify. On December 1, 2020, defense counsel filed a second posttrial motion, which stated that it contained arguments that were raised by the defendant *pro se*, but were adopted and incorporated by defense counsel. On December 3, 2020, additional posttrial claims were filed by the defendant *pro se*, prior to a hearing that was scheduled for that date. These claims, too, were thereafter adopted and incorporated by defense counsel.

¶ 59    The December 3, 2020, hearing began with argument from defense counsel on all three of the posttrial motions. The State presented argument in response, which was followed by reply argument from defense counsel. The circuit court then went through the motions issue by issue, and denied all three motions entirely. On December 14, 2020, defense counsel filed a motion to reconsider the denial of the posttrial motions.

¶ 60    On March 3, 2021, a hearing was held. At the outset of the hearing, the circuit court noted, *sua sponte*, that it believed there was "a problem with two of the verdicts returned, on two of the counts." The circuit court stated that it was concerned that the verdicts of guilty on both reckless discharge of a firearm and aggravated discharge of a firearm presented "legally inconsistent verdicts." The circuit court reasoned that "the elements of the offense in each requires a different and inconsistent state of mind and they cannot stand together," and stated the court's concern that there would be reversal on appeal if sentences were imposed on both counts. The circuit court

28

noted that it was raising the issue so that the parties could present written briefs on the issue. The court then continued the defendant's sentencing hearing, to allow time for briefing.

¶ 61    On May 11, 2021, a hearing was held. At the outset of the hearing, the circuit court noted that the defendant's December 14, 2020, motion to reconsider the denial of his posttrial motions had not yet been heard. Defense counsel then presented argument in support of that motion. Ultimately, the circuit court denied the motion to reconsider. The circuit court then returned to the question of "legally inconsistent verdicts." The State argued that the verdicts were not inconsistent, in part because "the charging instruments, the reckless discharge essentially says 'while others were present,' " whereas with regard "to the [aggravated] discharge, it listed a specific individual." Therefore, the State argued, "it's well within reason that the jury could have determined both that [the defendant] recklessly discharged in the presence of others, and that he intentionally discharged the firearm at a specific person." Defense counsel, after reviewing the charging instruments, subsequently stated that counsel held "the reasonable and good faith belief that the State's position [was] correct." Defense counsel added: "That because each of the reference counts alludes to a separate and distinct victim, that it is not inconsistent, Your Honor." The circuit court then stated: "Based on what's been presented, my review of *** each memorandum filed by the State, the arguments and positions presented here today, I am going to find that the verdicts [in question] are not legally inconsistent."

¶ 62    Thereafter, the defendant's sentencing hearing was held. The parties and the circuit court established that (1) the defendant faced up to 30 years on the most severe of the convictions, armed habitual criminal; (2) the convictions for unlawful possession of a weapon by a felon, and unlawful possession of firearm ammunition by a felon, both would merge with the armed habitual criminal conviction; and (3) the three sentences to be entered by the circuit court (for one count each of armed habitual criminal, reckless discharge of a firearm, and aggravated discharge of a firearm)

29

would be served concurrently, rather than consecutively. The State asked for the defendant to be sentenced to (1) 22 years' imprisonment for the armed habitual criminal conviction, to be served at 85%, (2) 6 years for the reckless discharge of a firearm conviction, and (3) 15 years for the aggravated discharge of a firearm conviction, with the latter two sentences to be served at 50%, and all sentences to run concurrently. Ultimately, the circuit court sentenced the defendant to 13 years for the armed habitual criminal conviction, to be served at 85%, and to be served concurrently with 4 years for the reckless discharge of a firearm conviction and concurrently with 10 years for the aggravated discharge of a firearm conviction.

¶ 63    On May 13, 2021, defense counsel filed a motion to reconsider sentence. Therein, counsel contended that the defendant's sentences were excessive. On May 14, 2021, a hearing was held on the motion to reconsider sentence. After the hearing, the motion was denied. This timely appeal followed. Additional facts will be presented as necessary in the remainder of this order.

¶ 64                                                    II. ANALYSIS

¶ 65    On appeal, the defendant contends that (1) the State did not prove, beyond a reasonable doubt, that the defendant is the individual who discharged the shotgun on October 5, 2017; (2) the circuit court erred in its instructions to the jury, which resulted in inconsistent verdicts with regard to the offenses of reckless discharge of a firearm and aggravated discharge of a firearm, which the defendant alleges "cannot stand simultaneously"; (3) the circuit court abused its discretion when it allowed the State to call a witness, Bobbie Russell, who was not disclosed to the defendant on the State's witness list; (4) the circuit court abused its discretion when it allowed other-crimes evidence of firearms "that had no link to the crime"; and (5) the defendant's trial counsel was ineffective with regard to counsel's cross-examination of witness Russell. The State counters that the defendant's claims have no merit. We address each claim in turn.

¶ 66　The defendant first contends that the State did not prove, beyond a reasonable doubt, that the defendant is the individual who discharged the shotgun on October 5, 2017. Thus, the defendant challenges the sufficiency of the evidence used to convict him. When a defendant makes such a challenge, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. See, *e.g.*, *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). We will not reverse a criminal conviction unless the evidence presented at trial is so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id*. We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id*. There is no requirement that this court disregard inferences that flow from the evidence, or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id*. at 416-17. We do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact. *Id*. at 416. "Circumstantial evidence is proof of facts or circumstances that give rise to reasonable inferences of other facts that tend to establish guilt or innocence of the defendant." *Id*. at 417. It is axiomatic that "[a] defendant can be convicted solely on circumstantial evidence," and that "[t]he trier of fact does not have to be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence." *Id*.

¶ 67　In this case, the defendant posits that the testimony provided by Douglas, Elizabeth, and Russell was "unreliable and inconsistent," and argues that Douglas's testimony that the defendant fired the shotgun from 20 or 30 feet away "is false." The defendant also claims that both Douglas and Russell were "extremely intoxicated," and therefore their testimony should "be ignored." The

defendant further claims that the testimony of the Funnemans should be excluded because "they all lied about" the presence of Russell at the scene. The defendant suggests that "Russell was inconsistent, evasive, silent, and was unable to recall material and significant details about which one would expect testimony at trial," and that accordingly, "none of his testimony could be relied upon by a reasonable finder of fact." The defendant also complains about Russell's behavior on cross-examination. Moreover, the defendant argues that because Monnet's testimony that the shotgun was fired from approximately 5 feet away contradicts Douglas's testimony that the defendant was 20 or 30 feet away, the defendant could not have been the person who discharged the shotgun. The defendant, without citation to authority, further argues that because there was no physical evidence connecting him to the shotgun, his convictions cannot stand.

¶ 68 We first note that the defendant has provided no case law that supports his argument that the evidence complained of by the defendant in this case was not admissible, or that supports any argument that the circuit court was required to exclude any of the evidence. Indeed, the defendant acknowledges the well-established point of law that evidence of a witness's intoxication goes to the weight to be accorded to that testimony, not its admissibility. We conclude that all of the defendant's complaints on appeal with regard to this issue are in fact quarrels with the conclusions the jury drew from the evidence, rather than valid arguments that the jury should not have been allowed to consider the evidence in the first place. Moreover, for the following reasons, we do not agree with the defendant that no reasonable jury could have found that the defendant discharged the shotgun.

¶ 69 First, as described in extensive detail above, the jury was apprised of all of the circumstances surrounding the shooting, which included the fact that there were inconsistencies in the testimony of various witnesses, and the fact that both Douglas and Russell were highly intoxicated. As the defendant concedes, evidence of a witness's intoxication goes to the weight to

32

be accorded to that testimony, not its admissibility. See, *e.g.*, *People v. Gray*, 2017 IL 120958, ¶ 40 ("Evidence that a witness was drinking near the time of an event about which she testifies is probative of the witness's sensory capacity [citation] and affects the weight to be given her testimony [citation]," but "the fact that a witness had been drinking alcohol or was drunk does not necessarily preclude the trier of fact from finding the witness credible."). Second, even if we were to assume, *arguendo*, that the testimony of both Douglas and Russell should be disregarded completely, that does not change the fact that all of the witnesses—including Pipkins, who, as the State pointed out, had no reason to lie for the Funnemans or anyone else—testified that the defendant was the only adult inside the residence, rather than on the porch, when the shotgun was fired, and the physical evidence, including that from the defendant's own expert witness, proved that the shotgun had to have been fired from inside the residence, not on the porch. Pipkins also testified that he did not see firearms being carried by any of the men who entered the porch, and when asked on cross-examination if Russell had a shotgun, Pipkins answered, "It would have been—had to have been after the fact that we were fighting. When he originally came back into the house, no he didn't. I know because I was fighting with him." Disregarding the testimony of Douglas and Russell also does not change the fact that Hannah Shearer testified that the defendant later told her that he was the one who fired the shotgun. Moreover, Elizabeth testified that none of the men who accompanied her to the residence had "any firearms on them."

¶ 70    As explained above, when a defendant challenges the sufficiency of the evidence used to convict that defendant, we do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact. *Saxon*, 374 Ill. App. 3d at 416. We will not reverse a criminal conviction unless the evidence presented at trial is so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* We allow all

reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id*. There is no requirement that this court disregard inferences that flow from the evidence, or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Id*. at 416-17. Applying these principles to the facts of this case, we conclude that the State adduced sufficient evidence at the defendant's trial— described in extensive detail above—for a rational jury to conclude, beyond a reasonable doubt, that the defendant was the individual who discharged the shotgun during the incident in question.

¶ 71    With regard to the defendant's argument that because there was no physical evidence connecting him to the shotgun, his convictions cannot stand, we reiterate that the defendant has cited no authority in support of this proposition. Accordingly, the defendant has forfeited consideration of this argument. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). Forfeiture notwithstanding, this contention is completely without merit. See, *e.g.*, *People v. Williams*, 182 Ill. 2d 171, 192 (1998) ("Proof of physical evidence connecting a defendant to a crime has never been required to establish guilt."). For all of these reasons, the defendant's first contention on appeal fails.

¶ 72    The defendant next contends that the circuit court erred in its instructions to the jury, which resulted in inconsistent verdicts with regard to the offenses of reckless discharge of a firearm and aggravated discharge of a firearm, which the defendant alleges "cannot stand simultaneously." In support of this argument, the defendant points to no particular jury instruction that he believes was given in error. Instead, he cites general principles about legally inconsistent verdicts, then, citing *People v. Mitchell*, 238 Ill. App. 3d 1055 (1992), posits that "[t]his court has further held that convictions for separate charges involving knowing and reckless conduct are inconsistent where

34

[the] State's evidence, the jury instructions, and the charges all failed to distinguish between [d]efendant's intent when he fired certain shots, and when he fired others."

¶ 73    However, the State is correct that, unlike in *Mitchell*, in this case all of the witness testimony was that only one shot from the shotgun was fired, not multiple shots, and that with regard to that single shot, there were "separate victims for each of the charged offenses," with Douglas being "the listed victim [in the indictment] for the aggravated discharge of a firearm offense, while the indictment for reckless discharge of a firearm indicated defendant 'endangered the bodily safety of others,' " meaning those who were standing near Douglas when the shot was fired from the shotgun. The State is also correct that when the circuit court raised this issue, *sua sponte*, after the defendant's trial, the State responded in accordance with the indictments, pointing out for the circuit court the same arguments now made by the State on appeal. As the State aptly notes, in the circuit court, the defense agreed with the State's position once these arguments were made, and the circuit court thereafter agreed as well. The State is further correct in its assertion that this court has held that verdicts for offenses with differing mental states are legally consistent when the offenses were committed in a single act, but against separate victims. See, *e.g.*, *People v. Bustamante*, 334 Ill. App. 3d 515, 522 (2002) (where "[t]he victims and the harms are clearly separable, and the State intended to charge and prove two separate crimes," a "jury rationally could have concluded that defendant acted knowingly in damaging [a squad car window] but acted recklessly in causing the consequential endangerment to the safety of the officer as evidenced by the shattered glass spraying the officer").

¶ 74    We agree with the State that this case is governed by the principles set forth in *Bustamante*, not—as suggested by the defendant in his reply brief—by *People v. Fornear*, 176 Ill. 2d 523 (1997), because, as the *Bustamante* court pointed out, "*Fornear* was concerned with mutually

incompatible mental states regarding a defendant's act or course of conduct toward one victim." 334 Ill. App. 3d at 521. Accordingly, because in this case the indictments clearly set out a single named victim—Douglas—for the aggravated discharge of a firearm offense, and clearly stated that the reckless discharge of a firearm offense occurred because the defendant "endangered the bodily safety of" multiple victims, and because—in accordance with the reasoning set forward in *Bustamante*—the jury in this case rationally could have concluded that the defendant acted knowingly by firing the shotgun at Douglas, but acted recklessly by firing in the direction of multiple other individuals, there was no error in this case.

¶ 75    The defendant next contends that the circuit court abused its discretion when it allowed the State to call a witness, Bobbie Russell, who was not disclosed to the defendant on the State's witness list. The defendant further argues that the circuit court erred when it found that the defense was not surprised by the State calling Russell, because even if the defense admittedly knew of Russell "in general," that does not mean the defense was not surprised when the State called Russell as a witness. The defendant posits that the State "misled defense counsel into reasonably concluding that Russell would not testify at the trial," which "unfairly prejudiced" the defense, because "proper disclosure would likely have resulted in defense counsel properly cross-examining Russell."

¶ 76    However, the State is correct that the circuit court's rulings with regard to this issue are reviewed for an abuse of discretion, and that an abuse of the circuit court's sound discretion occurs in the context of this issue only if the defendant meets his or her burden to show surprise or prejudice to the defendant. See, *e.g.*, *People v. Zarebski*, 186 Ill. App. 3d 285, 290 (1989). In light of the fact that it is undisputed that defense counsel interviewed Russell approximately one week before the trial, and that the defendant himself asked, during a conference just prior to jury selection, that Russell be included in the list of potential witnesses that was to be read to potential

jurors, we agree with the State that the defendant cannot meet his burden of showing surprise or prejudice as a result of the fact that the State did not list Russell as a potential witness prior to trial. We further agree with the State's assertion that the defendant "undeniably had ample time to prepare his case with knowledge of Russell's presence," an assertion that is supported by the fact that defense counsel made multiple references to Russell during counsel's opening statement— long before the State attempted to call Russell as a witness—and in fact suggested, during that statement, that Russell may have been the person who fired the shotgun during the incident. The State also aptly notes that although it "maintains that no prejudice occurred here *** the court nevertheless gave defendant an opportunity to cure any prejudice he may have suffered from Russell's testimony by granting him some time to interview Russell before he testified." The State further correctly notes that the defendant "did not request a continuance after the State announced its intention to call Russell," which means that under relevant precedent, the defendant has forfeited any claim of error. See, *e.g.*, *People v. Robinson*, 157 Ill. 2d 68, 79, 82 (1993).

¶ 77    The State raises another reason why there was no discovery violation in this case. As the State correctly notes, it did not issue a subpoena to Russell until August 4, 2020, which was the second day of trial. The State posits that "[t]his shows that the State did not form the intent to call Russell until after" the trial began, which under relevant precedent means that "disclosure of Russell by the State to the defense [was not] required until August 4, 2020, when the State formed the intent to call Russell." See, *e.g.*, *People v. Shiflet*, 125 Ill. App. 3d 161, 179-80 (1984). As the State further notes, by this time defense counsel "had been in possession of Russell's statement for ten days, had tendered his statement to the State, and had issued its own subpoena for Russell on August 3, 2020." For all of these reasons, we agree with the State that no discovery violation occurred under the circumstances of this case, and we further agree that even if there was a discovery violation, the circuit court did not abuse its sound discretion by allowing Russell to

37

testify, because any prejudice to the defendant was cured when defense counsel was given the opportunity to again speak with Russell prior to Russell's testimony.

¶ 78    The defendant next contends that the circuit court abused its discretion when it allowed other-crimes evidence of firearms "that had no link to the crime." He posits that "considering that there was no weapon recovered *** none of the firearms evidence presented sufficiently connected [him] to the crimes." He argues that (1) McWhorter should not have been allowed to testify that he saw a shotgun in the defendant's kitchen approximately two weeks prior to the date of the charged crimes, because "McWhorter's testimony amounted to nothing more than an overly broad and vague statement that [McWhorter] had seen something that *resembled* a shotgun in the corner" (emphasis in original); (2) Shearer should not have been allowed to testify that she saw a gun in the defendant's residence, because "Shearer was a biased witness for the State," and because Shearer never testified that the defendant possessed the gun she alleged she saw in the residence; and (3) the State should not have been allowed to present evidence of the BB gun found in the couch cushion of the defendant's residence, because "according to the expert testimony from both parties, it is indisputable that the pellets found in the doorframe were expelled from a shotgun, not a BB gun," which means that the BB gun "was not a suitable weapon for the commission of the crime" and in fact "bore no connection to the charged offenses." He posits that the BB gun "evidence served no purpose other than to inflame the passions of the jury and cause them to conclude that because [he] owned a BB gun, he must have possessed a shotgun."

¶ 79    We first note that the State is correct that the evidence about a BB gun being found in the cushion of a couch at the defendant's residence was introduced by defense counsel, not the State, during defense counsel's cross-examination of Detective Monnet. In addition, the fact that a BB gun was found at the residence was mentioned by defense counsel in his opening statement. It is axiomatic that a party may not complain on appeal of error that the party itself injected into the

38

trial. See, *e.g.*, *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). Accordingly, we decline to consider the defendant's arguments related to the BB gun evidence.

¶ 80　With regard to the testimony of McWhorter and of Shearer, we conclude, as explained below, that under relevant precedent, there was no error. It is a well-established principle of law that "[e]vidence of crimes for which a defendant is not on trial is inadmissible if relevant merely to establish the defendant's disposition or propensity to commit crime." *People v. Manning*, 182 Ill. 2d 193, 213 (1998). To be admissible, the other-crimes evidence must have some threshold of similarity to the charged crimes. *People v. Donoho*, 204 Ill. 2d 159, 184 (2003). Once a trial judge finds some relevance in the other-crimes evidence, the judge must conduct a balancing test to determine whether its probative value is substantially outweighed by its prejudicial effect. *People v. Pikes*, 2013 IL 115171, ¶ 11. The determination of whether the other-crimes evidence should be admissible is not dependent on whether the evidence is prejudicial, as the evidence is unquestionably prejudicial to a defendant. *People v. Perez*, 2012 IL App (2d) 100865, ¶ 45. Instead, the concern is that the prejudice is undue or unfair, or of the type that would lure the factfinder into finding the defendant guilty on a different ground than from the specific proof presented on the charged offense. *People v. Maya*, 2017 IL App (3d) 150079, ¶ 66.

¶ 81　We review the admission of other-crimes evidence for an abuse of discretion. *Donoho*, 204 Ill. 2d at 182. An abuse of discretion is found where the circuit court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the circuit court's view. *Id*. "Evidence regarding a weapon may be admitted into evidence where there is proof to connect it to the defendant and the crime." *People v. Liner*, 356 Ill. App. 3d 284, 294 (2005). A sufficient connection to the crime may be "shown if the defendant's weapon is suitable for the commission of the charged crime." *Id.* As the Illinois Supreme Court has held, "[i]t is only necessary that the

39

object at least be suitable for the commission of the crime, but it is not necessary that the object actually be used in committing the crime." *People v. Free*, 94 Ill. 2d 378, 415-16 (1983).

¶ 82    In this case, the testimony provided by McWhorter and Shearer is described in extensive detail above. Of relevance to this issue, McWhorter testified that on September 22, 2017—approximately two weeks before the shooting incident in question—he gave Hannah Shearer a ride to a house in Dieterich. When they arrived at the residence, the defendant was "in the kitchen." McWhorter testified that "[i]n a corner" of the residence, he saw what "[l]ooked like a shotgun." He testified that he had been around firearms before, and knew what a shotgun looked like. He testified that the firearm he saw "looked like a pump shotgun." Shearer testified that she was present at the defendant's residence on the day of the shooting—October 5, 2017—and that she saw "just one" firearm at the defendant's residence on that date. She testified that she was not very familiar with firearms, but described the one she saw as "a bigger one."

¶ 83    We agree with the State's assertion that "[t]he collective description provided by McWhorter and Shearer was consistent with the description provided by the occurrence witnesses, who all testified the weapon discharged on October 5 was a shotgun." We note as well that both expert witnesses testified that the damage found at the residence resulted from the firing of a shotgun. As the State aptly notes, the testimony of McWhorter and Shearer "established the gun [each of them saw] was similar to a shotgun," which means that their testimony was about a weapon "suitable for the commission of the crime." The State posits that "[b]ecause the weapon was suitable for committing the crimes with which defendant was charged, and because McWhorter's and Shearer's testimony connected defendant to a weapon similar to the one used by him on October 5, this evidence was highly probative and relevant," which means that "[a]dmission of this evidence was not in error." We agree with this assessment, and therefore do not agree with the defendant that the circuit court's decision to admit the testimony of McWhorter

40

and Shearer was arbitrary, fanciful, or unreasonable; further, we do not agree that no reasonable person would take the circuit court's view. See, *e.g.*, *Donoho*, 204 Ill. 2d at 182. Accordingly, we do not agree with the defendant that the circuit court abused its discretion in making its rulings. See, *e.g.*, *id.*

¶ 84    The defendant's final contention on appeal is that the defendant's trial counsel was ineffective with regard to counsel's cross-examination of Russell. The defendant acknowledges the well-established points of law that defense "counsel's decisions regarding how to cross-examine a witness involve the exercise of professional judgment and are entitled to substantial deference from a reviewing court," and that defense "counsel's approach to cross-examination supports a claim of ineffective assistance of counsel only if that approach is objectively unreasonable." That acknowledgement notwithstanding, the defendant contends that defense counsel's approach in this case was objectively unreasonable because, following the recess during which Russell was told that he might face jail time for contempt if he continued to be uncooperative, "one must infer it is likely Russell would have participated in cross-examination if he had known he was required to do so." The defendant posits that "Russell was a vulnerable witness," and that "[o]ne can infer he would have offered testimony favorable to [the defendant] had cross-examination continued." Although the defendant does not explain from what facts he derives the latter inference, he speculates that had defense counsel continued his cross-examination of Russell after the recess, counsel "could have elicited testimony that the actual shooter was Russell." He argues that he "was severely and unfairly prejudiced because evidence of reasonable doubt would have come from the cross-examination," and further posits that Russell "was not impeached to the extent he should have been."

¶ 85    We agree with the State that defense counsel's approach to his cross-examination of Russell, following the recess, was far from objectively unreasonable, and in fact was clearly a

41

sensible and rational trial strategy. As the State notes, counsel's decision to discontinue his cross-examination came only after (1) Russell had been admonished outside the presence of the jury that he might be found in contempt and jailed if he continued to be uncooperative, (2) Russell twice apologized for his behavior, and (3) defense counsel had a private conversation with the defendant. Discontinuing cross-examination at this point in time allowed defense counsel to thereafter paint Russell as a biased, drunken, clown-like, and nonsensical witness with a grudge against the defendant.

¶ 86    As described in detail above, defense counsel seized this opportunity in his closing argument, contending that on the night in question, "an angry, drunken mob" appeared at the defendant's residence. After pointing out that Douglas and Elizabeth lied to the police about Russell's presence that night, and after again arguing that they participated in "vigilante mob action," defense counsel opined that Douglas "and his co-conspirators really, really have nothing but contempt for justice in this county and for the justice system." He added, "And indirectly to you as jurors they have contempt for you." With regard to Russell, defense counsel then added:

> "Especially, especially Bobbie Russell. It wasn't contempt for me he was showing. He was showing it to the court by what he did that day. And he showed it to you when he testified yesterday. Wouldn't answer the questions."

¶ 87    Further exploiting Russell's belligerence during the trial, defense counsel argued that Douglas and the others realized that Russell was the "weak link" in their "conspiracy" to harm the defendant, reiterating:

> "He is the weak link in the conspiracy that when you saw how he behaved when I asked him. I was trying to ask him straight out yes [or] no questions. 'Sir just answer questions we will get you out of here and get you done.' No no no. Possum wasn't going to answer questions. *** Doug Funneman knew that Possum would screw up the story if the police

ever came calling and that's why they buried him for almost three years. That's why the stakes were so high because of the things that could have done. You got Possum drinking ten shots of fireball a day and still downing six or seven drinks a day, he wouldn't have been able to talk to the police for more than a few minutes before he blew his top just like he did when I was talking to him."

¶ 88 Defense counsel subsequently added, "Guess what Doug Funneman and his conspirators want to do to you folks? Each and every one of you. They want to dupe you." Counsel then argued that there were many shortcomings in the police investigation in this case, and various ways in which the police "dropped the ball" and failed to pick it back up. Counsel thereafter returned to Russell, stating:

"Bobbie Russell, he was a clown. He was part of the conspiracy. And he wanted—the people in the conspiracy did not want him to talk to the police. And consistent with that, even though they knew about him last week, the police still didn't go out and get a statement from him. They still didn't get any part of the investigation. Still didn't submit him to a story as part of the investigation. They just let him come up here and answer questions and then he didn't like my questions so he quit answering questions."

¶ 89 Counsel discussed in detail some of the other evidence presented, and why that evidence called into question the State's theory that the defendant fired the shotgun. Counsel thereafter returned to Russell again, stating as follows:

"So Carla explained why Bobbie Russell is a clown. Not worthy of belief because all these things, they happened immediately after this, she got a chance to see him and none of it happened the way he said it, because there would have been objective proof he was injured. He'd have blood on his face, his head, whatever."

43

¶ 90 All of the foregoing arguments made by defense counsel in his closing argument hinged upon the jury's perception of Russell as, among other things, incredible and untrustworthy, and absolutely supported defense counsel's theory that Russell and the Funnemans were conspiring to convict the defendant of offenses that the defendant did not commit. Had defense counsel continued with his cross-examination of Russell, and had the apologetic Russell become contrite, docile, and cooperative, defense counsel would have lost the ability to make these arguments. Because by the time he discontinued his cross-examination, defense counsel had already gotten Russell to again admit to the jury that Russell had consumed "ten Fireballs" on the day of the shooting, and was "a drunk," as well as that Douglas too was drunk at the time, it was entirely conceivable that these lost arguments would have come with no new admissions of value from Russell.

¶ 91 Indeed, the defendant's argument on appeal that if defense counsel had continued with his cross-examination of Russell, Russell would have admitted that he, not the defendant, was the shooter, is based upon nothing more than wild speculation. This is particularly true in light of the fact that defense counsel had already tried, once before, to get one of the State's witnesses to agree with the theory that Russell was the actual shooter. As described above, on recross-examination, when asked if Douglas hid Russell from the police because Douglas "brought Bobbie Russell to [the defendant's] home *** Russell discharged the shotgun *** [a]nd then [Douglas] hid [Russell] from the police and from everybody else," Douglas testified, "That's totally false." There is no objective reason to believe that defense counsel would have achieved a different result if he had asked Russell the same question.

¶ 92 In short, Russell was a much more useful witness for the defense when he behaved like a buffoon. There was no sound strategic reason for defense counsel to risk the possibility that the apologetic Russell would redeem himself in the eyes of the jury if cross-examination continued.

44

Thus, we find no merit to the defendant's argument that defense counsel was ineffective with regard to counsel's cross-examination of Russell, and that as a result the defendant is entitled to a new trial. See, *e.g.*, *People v. Metcalfe*, 202 Ill. 2d 544, 561 (2002) ("judicial scrutiny of a counsel's performance is highly deferential so that a defendant claiming ineffective assistance of counsel must overcome a strong presumption that the challenged actions of counsel were the product of sound trial strategy"); see also, *e.g.*, *People v. Mitchell*, 105 Ill. 2d 1, 15 (1984) ("The issue of incompetency of counsel is always to be determined from the totality of counsel's conduct").

¶ 93                                    III. CONCLUSION

¶ 94    For the foregoing reasons, we affirm the defendant's convictions and sentences.


¶ 95    Affirmed.